UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIAN A. SAMPSON, an individual,<br><br>                 Plaintiff,<br><br>v.<br><br>VITA-MIX CORPORATION, an Ohio<br>Corporation,<br><br>                 Defendant. | Case No.:  17cv233-GPC(BGS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[Dkt. No. 34.]** |

Before the Court is Defendant's motion for summary judgment or, in the alternative, partial summary judgment.  (Dkt. No. 34.)  An opposition was filed on May 3, 2018.  (Dkt. No. 35.)  A reply was filed on May 18, 2018.  (Dkt. No. 39.)  The Court finds that the matter is appropriate for decision without oral argument pursuant to Local Civ. R. 7.1(d)(1).  After a review of the briefs, supporting documentation and the applicable law, the Court GRANTS in part and DENIES in part Defendant's motion for summary judgment.

## Background

On February 6, 2017, Plaintiff Adrian Sampson ("Plaintiff" or "Sampson") filed a complaint against his former employer Defendant Vita-Mix Corporation ("Defendant" or "Vitamix") alleging race discrimination.  (Dkt. No. 1, Compl.)  Plaintiff was a sales

representative for Vitamix from May 10, 2013 to March 7, 2016 and was assigned to work at various locations, including Costco stores, in the San Diego market. (Id. ¶ 10.)

The Complaint alleges causes of action for (1) race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; (2) retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; (3) race discrimination under the Civil Rights Act of 1866, 42 U.S.C. § 1981; (4) retaliation under the Civil Rights Act of 1866, 42 U.S.C. § 1981; (5) race discrimination under California Fair Employment and Housing Act, ("FEHA"), California Gov't Code sections 12900 - 12996; (6) retaliation under FEHA; (7) constructive discharge; (8) breach of contract; and (9) breach of the implied covenant of good faith and fair dealing. (Dkt. No. 1, Compl.)

Defendant moves for summary judgment or, in the alternative, partial summary judgment on the claims in the Complaint, including the claim for punitive damages. In his opposition, Plaintiff consents to entry of judgment on his claims for unlawful retaliation under Counts 2, 4, and 6, as well as breach of contract under Count 8 and breach of the implied covenant of good faith and fair dealing under Count 9. (Dkt. No. 35 at 8[1] n. 2.) Therefore, the Court GRANTS Defendant's motion for summary judgment on the second, fourth, sixth, eighth and ninth causes of action. The remaining causes of action are race discrimination under Title VII, 42 U.S.C. § 1981 and FEHA under a theory of disparate treatment, and constructive discharge.

**Factual Background**

Vitamix manufactures high performing blenders for consumers and businesses such as the restaurant and hospitality industries. (Dkt. No. 34-4, D's App'x, Ex. 3, Olsen Decl. ¶ 3.) Vitamix markets and promotes its products through partnerships with companies, such as Costco, where sales representatives demonstrate and sell its products directly to consumers. (Id.) The Western Region of Vitamix' sales team covers Arizona,

---

[1] Page numbers are based on the CM/ECF pagination.

Southern California, Hawaii, Nevada and Utah. (Id. ¶ 4.) The Western Region is overseen by a Sales Manager ("Regional Manager"), who supervises a number of Assistant Regional Sales Managers ("Assistant Managers"). (Id.) The Assistant Managers schedule show assignments for the sales representatives within his or her sales territories. (Id.) At the time of Plaintiff's employment, Ed Paul ("Paul") was the Regional Manager for the Western Region, and Scott Guthrie ("Guthrie") was the Assistant Manager for the Western Region primarily responsible for the San Diego, California, Reno, Nevada and Utah sales territories. (Dkt. No. 35-1, P's Response to D's SSUF, No. 5.)

Plaintiff and his brother have known Guthrie for about 30 years since college. (Id., No. 36.) In 2013, Plaintiff approached Guthrie about his interest in working for Vitamix. (Dkt. No. 34-4, D's App'x, Ex. A, Sampson Depo. at 73:3-19.) He dealt with Guthrie's then wife, Jodie Rowley ("Rowley"), during the pre-hiring process. (Id. at 76:5-18.) In May 2013, Kelly Services[2] assigned Plaintiff to perform outside sales functions for Vitamix and Vitamix assigned Plaintiff to work in the San Diego, California territory. (Dkt. No. 34-4, D's App'x, Ex. 3, Olsen Decl. ¶ 5.)

Plaintiff's first assignment for Vitamix was a ten-day show at the Santee Costco location, from May 31, 2013 to June 9, 2013, and Guthrie assisted Sampson during this show. (Dkt. No. 35-1, P's Response to SSUF, Nos. 6-7.) Until Plaintiff's voluntary resignation on March 7, 2016, Vitamix assigned Plaintiff to numerous road shows and inline promotional events at various locations, including Costco stores in San Diego/South East, Vista, La Mesa, Poway, Carmel Mountain, Santee, Carlsbad,

_____

[2] In its separate statement of undisputed facts, Vitamix states that Kelly Services hired Plaintiff around May 10, 2013 to perform outside sales functions at various shows. (Dkt. No. 35-1, P's Response to D's SSUF, No. 3.) Plaintiff disputes the fact that Kelly Services hired Sampson stating that Vitamix was his employer as Vitamix controlled all terms and conditions of his employment and Kelly Services only performed payroll and benefit functions for Defendant. (Id.) In reply, Defendant does not clarify or dispute Plaintiff's assertion and it does not appear that Vitamix is asserting it was not the employer of Sampson. Accordingly, this dispute does not appear to be materially relevant to the issues in this case.

Temecula, San Marcos, Mission Valley, and Morena.  (Id., No. 8.)  In 2013, Plaintiff worked a total of 134 days on assignments and earned a total of $39,316.00 or approximately $293.40 per day.  (Id., Nos. 9, 10.)  In 2014, Plaintiff worked a total of 253 days on assignments and earned a total of $78,357.00 or approximately $309.71 per day.  (Id., Nos. 11, 12.)  From January 1, 2015 to March 7, 2016, Plaintiff worked a total of 205 days and earned a total of $87,475.58 or approximately $426.71 per day.  (Id., Nos. 13, 14.)  With respect to Plaintiff's earnings in 2015, Plaintiff ranked 12th out of 151 sales representatives in the Western Region with respect to commissions.  (Dkt. No. 34-4. D's App'x, Ex. 3, Olsen Decl. ¶ 6.)

Paul, the Regional Manager, and Guthrie, the Assistant Manager, testified they used guidelines to schedule sales representatives to shows.[3]  Prior to 2012, the Regional Managers were responsible for assignment of shows but when the Assistant Managers started in 2012, responsibility for show assignments gradually transferred to them for a period of five years.  (Dkt. No. 35-2, P's App'x, Ex. 4, Paul Depo. at 7:9-8:9.)  In deciding placement of sales representatives, Guthrie testified that he looked at sales experience, sales against the average, proximity to the promotion, seniority, availability, specific types of requests, and who was available to work with each other.  (Dkt. No. 34-4, Tello Decl., Ex. L, Guthrie Depo. at 5:25-6:13.)  Guthrie also testified that being a top representative involved not just sales, but also the representative's availability, willing to work attitude and ability to get along with other people such as other sales representatives and with Costco.  (Id. at 21:19-23.)  Paul similarly testified that the criteria for making assignments included sales performance, proximity to the location, tenure, and whether

---

[3] While Defendant cites to written Scheduling Guidelines policy, (Dkt. No. 34-4, Tello Decl., Ex. M at 222), Guthrie testified that he was not sure when the written policy was drafted or generated but he has followed the same guidelines for scheduling.  (Dkt. No. 34-4, Tello Decl., Ex. L, Guthrie Depo. at 20:4-20.)  An email from Patricia Neumann, in the HR Department, to Sampson stated that the written guideline did not issue until 2016.  (Dkt. No. 35-2, P's App'x, Ex. 9 at 95.)  Notwithstanding not having a written policy, Paul and Guthrie stated that they followed certain guidelines when scheduling sales representatives.

Costco requested a particular representative. (Dkt. No. 35-2, P's App'x, Ex. 4, Paul Depo. at 9:19-24:18:7-15.) Paul also testified that it was important and lucrative for sales representatives working together to get along. (Id. at 28:19-29:10.) Danny Stuart, another Assistant Regional Manager for the Western Region, stated that assignment criteria included availability, proximity, performance, the sales representative's overall attitude including how they got along with the managers and with customers, and if there were any prior complaints. (Dkt. No. 35-2, P's App'x, Ex. 10, Stuart Depo. at 8:15-9:5.) The ultimate goal in scheduling sales representatives is to maximize the sales for Vitamix. (Dkt. No. 34-4, D's App'x, Ex. P, Stuart Depo. at 9:8-12.)

In partnership with Costco, Vitamix schedules road shows and "inline promotions" at various Costco locations. (Dkt. No. 35-2, P's App'x, Ex. 2, Rowley Decl. ¶ 8.) Road shows for the 6300 model blenders market a more expensive blender specifically reserved for road shows and also market the "inline" blenders that are regularly sold at Costco. (Id.) Sampson testified that road shows were more lucrative because they displayed the 6300 blender, a more robust product, while the inline shows would sell the 5300 blender. (Dkt. No. 35-2, P's App'x, Ex. 1, Sampson Depo. at 83:24-84:6.) In addition, the road shows have a bigger booth making the representatives very visible to the shoppers while the inline shows are tucked away and do not sell as many machines. (Id. at 83:6-13.) Road shows were also more lucrative because not only are representatives selling the 6300 blender, but they are also making commissions on additional items such as containers, and selling products, such as spices and protein powders for use in the blenders, through a third party company. (Id. at 83:14-23.)

Sampson described the lucrative locations as "A" locations, while "B" locations were less lucrative, and "C" locations were the least lucrative as sales were low. (Dkt. No. 35-2, P's App'x, Ex. 1, Sampson Depo. at 85:14-17.) He states he was given a higher number of "B" and "C" locations compared to several other non-African Americans who were no more qualified than him. (Id. at 85:18-20.) He testified that the four "A" stores in San Diego were Morena, Mission Valley, Carlsbad, and Carmel

5

Mountain as they are the most lucrative. (Id. at 97:13-16.) The worst locations, the "C" locations, were El Centro, Chula Vista, and Southeast San Diego. (Id. at 150:5-13.) Rowley also states the 6300 road shows at Morena, Mission Valley and Carlsbad were more lucrative than other locations. (Dkt. No. 35-2, P's App'x, Ex. 2, Rowley Decl. ¶ 8.)

Among the four "A" stores, Sampson was assigned to two or three road shows a year at Carmel Mountain and worked one road show at Carlsbad and Morena. (Dkt. No. 35-2, P's App'x, Ex. 1 at 97:17-98:8.) He also worked three times at military bases, which was also a lucrative assignment. (Id. at 84:22-85:1.) Furthermore, he was assigned to a 17 day assignment in Hawaii and while he stated it was a terrible store, he had a great time with his wife. (Id. at 183:9-184:3.) However, he was never assigned to work at the Del Mar Fair which is one opportunity he really wanted since it was the most lucrative. (Id. at 84:9-15.) Plaintiff testified that although he lived closer to assignments located at Mission Valley, Morena and the San Diego County Fair, other representatives that lived farther away were given those locations, including representatives who were flown in from out of town and out of state. (Id. at 94:13-25.) As for inline stores, the top stores he worked at were Morena, Mission Valley, and Carmel Mountain. (Id. at 104:1-7.) He never worked an inline event at Carlsbad. (Id.)

Plaintiff claims he was not given the opportunity to work 6300 road shows at the more lucrative locations as frequently as white sales representatives. (Dkt. No. 35-2, P's App'x, Ex. Rowley Decl. ¶¶ 10, 11.) While he presented at one showing at Carlsbad and Morena, other representatives had more assignments there. (Dkt. No. 35-2, P's App'x, Ex. 1, Sampson Depo. at 102:21-103:3.) Sampson states that certain representatives were given the Mission Valley, Morena and San Diego County Fair locations that lived farther away than he did. (Id. at 94:13-25.) It is not disputed that Sampson and no African American were ever assigned to work at the County Fair while he was employed at Vitamix. (Dkt. No. 35-2, P's App'x, Ex. 1, Sampson Depo. at 84:11-20; Dkt. No. 35-2, P's App'x, Ex. 4, Paul Depo. at 21:23-25; 33:19-22.)

Paul White, Defendant's expert on labor economics, conducted a statistical analysis of Plaintiff's assignments compared with "all sales representatives" and "named comparators."[4] (Dkt. No. 34-4, D's App'x, Ex. 5, White Decl. ¶ 2.) White calculated the percentage of Plaintiff's assignments at the "A" locations as follows: "17% in 2013; 26% in 2014; 45% from January 1, 2015 to March 31, 2015; and 71% from April 1, 2015 to March 7, 2016." (Dkt. No. 34-4, D's App'x, Ex. 5, White Decl. ¶ 7; id., Ex. Y.) In contrast, "the percentage of assignments to the more lucrative locations for all sales representatives remained relatively constant during those same time periods . . . 37% in 2013; 37% in 2014; 35% from January 1, 2015 to March 31, 2015; and 40% from April 1, 2015 to March 7, 2016." (Dkt. No. 34-4, D's App'x, Ex. 5, White Decl. ¶ 8; id., Ex. Y.) White concluded that Plaintiff's "assignment to 'A' locations increased substantially during his career at Vita-Mix and was greater than the frequency by which all sales representatives were assigned to "A" locations." (Dkt. No. 35-2, P's App'x, Ex. 12, White Expert Report at 112.)

When looking at the performance measures of sales representatives of named comparators, the "percentage of assignments for the named comparators also increased during that same time period: 47% in 2013, 59% in 2014, 80% from 1/1/15 to 3/31/15, and 95% from 4/1/15 to 3/7/16.[5]" (Dkt. No. 35-2, P's App'x, Ex. 12, White Expert Report at 113; id., App'x C. at 142.) According to White, Sampson's assignment increased substantially during the course of his career and based on the trend, he would have been assigned "A" locations as frequently as the named comparators. (Dkt. No. 35-2, P's App'x, Ex. 12, White Expert Report at 113.) "His sales performance during this

---

[4] White defines "named comparators" as those referenced in Plaintiff's deposition and include "Stephanie Harris, Theresa Gregory, Mike Hudson, Jeff Werling, and Sylvester Nunez." (Dkt. No. 35-2, P's App'x, Ex. 12, White Expert Report at 109-10 & n. 1.)

[5] The named comparators from 4/1/15 to 3/7/16 include Theresa Gregory, Jeff Werling, and Sylvester Nunez, and not Stephanie Harris or Mike Hudson. (Dkt. No. 35-2, P's App'x, Ex. 12, White Expert Report, App'x C at 142.)

time started out as lower than the named comparators at the beginning of his career, but over time caught up to the named comparators in this category as well." (Id.)

Rowley, the former spouse of Guthrie, who worked in the pre-hiring process at Vitamix, stated that Sampson was treated disparately in the assignment of shows and location. (Dkt. No. 35-2, P's App'x, Ex. 2, Rowley Decl. ¶ 12.) Rowley was employed at Vitamix from February 1, 2013 to December 1, 2014[6] as Assistant to Paul, the Regional Manager for the Western Region. (Id. ¶ 3.) She knew Plaintiff prior to his employment at Vitamix when she was introduced to him by Guthrie in 2008. (Id. ¶ 5.)

She was personally aware that Plaintiff repeatedly asked Paul and Guthrie to be scheduled at the 6300 road shows at particular Costco locations. (Id. ¶ 10.) Guthrie told her that he felt that Sampson would be a good fit for a prime location. (Id.) But Paul continued to deny Sampson to work at the 6300 road shows at the more lucrative locations indicating that he was placing more "tenured" representatives in those locations. (Id. ¶ 11.) She heard Guthrie state that Vitamix has not had many "successful African-Americans" in the sales department. (Id. ¶ 13.) She also personally heard Guthrie make racial comments and jokes about African-Americans on many occasions prior to

---

[6] Defendant filed an objection to the Rowley declaration stating her declaration is inadmissible because it is filled with speculation and conclusory statements for which she has no personal knowledge. Vitamix argues Rowley served in a clerical position handling the pre-hiring process as the administrative assistant to Paul, the Regional Manager, and had no involvement in the scheduling of assignments or tracking the performance of sales representatives, and cannot offer competent testimony as to how or why Plaintiff and others were assigned to any particular, shows, locations or promotions. However, Rowley's declaration does not state she was involved in the scheduling or tracking of performance. Instead, as Paul's assistant, she personally observed the happenings in Paul's office, including personally observing Plaintiff and the other sales representatives while they performed their duties at Costco locations. Moreover, statements she heard made by Guthrie and Paul constitute an admission of a party opponent and is an exception to the hearsay rule. See Fed. R. Evid. 801(d)(2)(D); see Breneman v. Kennecott Corp., 799 F.2d 470 (9th Cir.1986) (multiple hearsay is admissible if each of the speakers was involved in the employer's decision). Thus, the Court overrules Defendant's objections to Rowley's declaration. However, the Court notes that her position at Vitamix terminated on December 1, 2014 about fifteen months prior to Plaintiff's resignation. Therefore, her statements are only probative as to the nature of Plaintiff's employment from May 10, 2013 until December 1, 2014, the date she was terminated.

Sampson working at Vitamix and when he was working there. (Id.) She personally observed that, throughout Sampson's tenure at Vitamix, Guthrie assigned Sampson to locations, shows and promotions to Costco locations, shows and promotions that were not as lucrative as locations to which white sales representatives, as well as other sales representatives who were not African American, were assigned. (Id. ¶ 16.)

She heard conversations between Guthrie and Paul discuss that the kind of people they want to represent Vitamix in a booth had to be fit, healthy looking people. (Id. ¶ 18.) In particular, both Guthrie and Paul said that overweight people, African-Americans and/or unattractive people in the Vitamix booth are not the representation they desired for the company. (Id. ¶ 18.) They each said that having a black person as the representative at the Costco shows would take away from sales because people would not want to buy a blender if a black person was standing in the booth. (Id.)

Guthrie said to Rowley that "Stephanie Harris should not be in the booth because she is overweight and not a good first impression for a customer to see when they walk up to a Vitamix booth." (Id. ¶ 19.) Guthrie also said, laughing, as he and Rowley were approaching a booth where Sampson was working, that, "when a black person is in the booth and wearing the black Vitamix polo all you can see is their teeth when they smile." (Id. ¶ 20.) On at least one occasion, Guthrie declined to hire an African-American as a representative because he said the applicant was black. (Id. ¶ 21.) These types of comments were made on several occasions, including directly to Rowley while she was reviewing the pre-hire audition videos. (Id. ¶ 22.)

Plaintiff claims Guthrie used the racially offensive statement "Ninja please" three times. (Dkt. No. 35-2, P's App'x, Sampson Depo., Ex. 1 at 113:9-25.) The first time he used it was prior to being hired at Vitamix when at one of the shows someone stated they had a Ninja blender, Guthrie responded "Ninja please." (Id. at 113:9-12.) At the time, Plaintiff told Guthrie he thought it was offensive and he probably should not say that at show locations. (Id. at 113:13-14.) Plaintiff alleges Guthrie used the phrase a second time but does not recall the context or circumstances surrounding its use. (Id. at 113:13-

17cv233-GPC(BGS)

15.)  The third time, Guthrie used it during a sales training course in front of 1,500 other sales representatives and Assistant Managers where Plaintiff was the only African-American.  (Id. at 113:16-25.)  When someone asked Guthrie, "What do you say when someone wants a Ninja blender?" he turned to Plaintiff and said, "Adrian, what do I say?"  (Id. at 113:16-25.)  Plaintiff responded, "Scott, we talked about this. I'm not going to go there with you."  (Id.)[7]

According to Plaintiff, the phrase "Ninja, please" refers to the competitor Ninja blender and is a racial reference to Asian Americans and he also "reasonably understood the comment to connote and invoke the phrase, 'Nigga please,' which is understood in the African-American community as a statement made in the context of a disagreement and/or is made to someone who is notoriously unreliable or untrustworthy."  (Dkt. No. 34-4, D's App'x, Ex. Q, P's Response to Interrog. No. 1 at 246.)  He claims he reported these comments to Guthrie on all four occasions.  (Id. at 116:22-117:8.)  Paul also knew about the comments when Plaintiff emailed Guthrie about the phrase on September 29 and Paul responded to the email.  (Id. at 117:9-12.)  Later, around November or December, he reported it to Pat Neumann ("Neumann"), in Human Resources ("HR").  (Id. at 117:13-19.)

On December 9, 2015, Neumann wrote a letter about the company's findings in response to Plaintiff's allegations of "Ninja please" statements, premium show assignments, expenses and a recent Costco incident.  (Dkt. No. 34-4, D's App'x, Ex. S, Neumann Ltr. dated Dec. 9, 2015 at 260.)  The letter acknowledged that the "Ninja please" statement occurred and it took remedial action to prevent further incidents.  (Id.)  Guthrie was placed on corrective action and given a professional workplace e-learning to

---

[7] Though not cited by the parties, Plaintiff also testified to a fourth incident when the following day when he was at Guthrie's house, Guthrie asked him to join a conversation he was having with another representative about the machines.   (Dkt. No. 35-2, P's App'x, Ex. 1, Sampson Depo. at 114:1-6.)  When Plaintiff picked up the phone, the other representative referred to him as "Ninja, please."  (Id. at 114:7-11.)

complete. (Dkt. No. 34-4, D's App'x, Ex. E, Neumann Depo. at 8:3-17.) As to his grievance concerning scheduling assignments, the investigation did not reveal any evidence of discrimination. (Dkt. No. 34-4, D's App'x, Ex. S, Neumann Ltr. dated Dec. 9, 2015 at 260.) It noted that only 30% of all sales representatives are assigned to work direct shows because there are fewer direct shows and assignments are based on location, tenure and sales production. (Id. at 261.) The investigation confirmed that non-Caucasians have been assigned to direct shows. (Id.) After reporting the "Ninja please" comment to Human Resources, he did not witness any other racial epithets or comments. (Dkt. No. 35-2, P's App'x, Ex. 1, Sampson Depo. at 118:14-17.)

On January 15, 2016, in response to emails from Plaintiff after the conclusion of Vitamix' investigation, Neumann sent him another email which Plaintiff saw as a negative attitude towards Plaintiff and his claims of disparate treatment. (Dkt. No. 35-2, P's App'x, Ex. 6, Neumann email dated Jan. 15, 2016 at 88.) The letter indicted they considered the matter closed and if he had any new information, he should present it to them. (Id.) She also noted that the tone of his emails sounded aggressive and demanding and in the future directed him to act professionally and with respect. (Id.) In another email dated February 26, 2016, Neumann discouraged him from raising further claims of disparate treatment and encouraged Sampson to leave Vitamix and find employment elsewhere if he is unable to move forward. (Dkt. No. 35-2, P's App'x, Ex. 8, Neumann email dated Feb. 26, 2016 at 93.) On March 7, 2016, Plaintiff voluntarily resigned. (Dkt. No. 35-2, P's App'x, Ex. 7 at 91.)

## Discussion

### A.  Legal Standard on Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp., 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. Id. at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. Id. at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.

////
////
////
////

17cv233-GPC(BGS)

## B. Disparate Treatment under Title VII, Title I and FEHA

Plaintiff asserts three causes of action of race discrimination based on disparate treatment under Title VII[8], 42 U.S.C. § 1981[9]; and FEHA[10].  Both parties agree and caselaw dictate that the analysis for race discrimination based on disparate treatment under all three statutes follow the burden-shifting framework announced for Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  See Mustafa v. Clark Cnty. Sch. Dist., 157 F.3d 1169, 1175, 1180 n.11 (9th Cir. 1998) (same McDonnell Douglas standard applies under Title VII and § 1981 for disparate treatment claims); Fonseca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 850 (9th Cir. 2004) (same legal principles apply to disparate impact under Title VII and § 1981 and same set of facts can give rise to both claims); Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 354-55 (2000) (applying McDonnell Douglas to FEHA).

Under the framework, an employee challenging an adverse employment action has the initial burden of establishing a prima facie case of discrimination.  Aragon v. Republic Silver State Disposal, Inc., 292 F.3d 654, 658 (9th Cir. 2002).   If the employee demonstrates a prima facie case, the burden of production then shifts to the employer "to articulate a legitimate, nondiscriminatory reason for terminating [the plaintiff's] employment."  Id.  If the employer provides a legitimate, nondiscriminatory reason, the presumption of discrimination falls away, and the plaintiff must demonstrate that the articulated reason is pretext for unlawful discrimination with evidence that is "both

---

[8] Title VII prohibits intentional acts of employment discrimination based on race, color, religion, sex, and national origin.  42 U.S.C. § 2000e–2(a)(1).

[9] Section 1981 prohibits discrimination in the "benefits, privileges, terms and conditions" of employment. 42 U.S.C. § 1981(b).  Although § 1981 does not reference "race," the United States Supreme Court has construed this section "to forbid all 'racial' discrimination in the making of private as well as public contracts."  St. Francis Coll. v. Al–Khazraji, 481 U.S. 604, 609 (1987).

[10] The Fair Employment and Housing Act ("FEHA") prohibits an employer from terminating an employee based on race or gender.  Cal. Gov't Code § 12940(a).

*specific* and *substantial* to overcome the legitimate reasons put forth by [the defendant]." Id. at 659 (emphasis in original).

### 1. Prima Facie of Discrimination

To establish a prima facie case of race discrimination, a plaintiff must offer proof that "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." Fonseca, 374 F.3d at 847 (quoting Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004)).

"The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." Aragon, 292 F.3d at 659. "The plaintiff need only offer evidence which 'gives rise to an inference of unlawful discrimination.'" Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994) (quoting Low v. City Of Monrovia, 775 F.2d 998, 1007 (9th Cir. 1985)).

Defendant argues that Plaintiff cannot establish the third and fourth factors that he suffered an adverse employment action because it did not subject Plaintiff to any adverse action such as demotion, discipline or termination, and that others similarly situated were treated more favorably. Plaintiff responds that the adverse employment action is the disparate treatment and his constructive discharge and that other Caucasion sales representatives were assigned lucrative road shows more often than him.

The Ninth Circuit "define[s] 'adverse employment action' broadly." Fonseca, 374 F.3d at 847. "[A] wide array of disadvantageous changes in the workplace constitute adverse employment actions." Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000) (discussing circuit split on what constitutes an adverse employment action and siding with First, Seventh, Tenth, Eleventh and D.C. Circuits that define adverse employment actions broadly). An adverse employment action is one that "materially affect[s] the

compensation, terms, conditions, or privileges of . . . employment." <u>Chuang v. Univ. of Cal. Davis, Bd. of Trustees</u>, 225 F.3d 1115, 1126 (9th Cir. 2000).  Adverse employment actions include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees."  <u>Wyatt v. City of Boston</u>, 35 F.3d 13, 15-16 (1st Cir. 1994) (citation omitted).  In addition, "an adverse employment action exists where an employer's action negatively affects its employee's compensation."  <u>Fonseca</u>, 374 F.3d at 847; <u>see</u> <u>Lyons v. England</u>, 307 F.3d 1092, 1113-14 (9th Cir. 2002).

Here, Plaintiff alleges his disparate treatment and constructive discharge constitute an adverse employment actions.  In support, Plaintiff cites to Defendant's expert, Dr. White's report showing that he was treated disparately compared with Caucasion comparators.  The percentage of Plaintiff's assignments at the "A" locations were as follows: "17% in 2013; 26% in 2014; 45% from January 1, 2015 to March 31, 2015; and 71% from April 1, 2015 to March 7, 2016."  (Dkt. No. 34-4, D's App'x, Ex. 5, White Decl. ¶ 7; <u>id.</u>, Ex. Y.)  However, the "named comparators'" percentage of assignment in "A" locations were as follows: "47% in 2013, 59% in 2014, 80% from 1/1/15 to 3/31/15, and 95% from 4/1/15 to 3/7/16."  (Dkt. No. 35-2, P's App'x, Ex. 12, White Expert Report at 113; <u>id.</u>, App'x C. at 142.)  Comparing Plaintiff with the "named comparators," the data reveals that the comparators were assigned to "A" locations with more frequency than Sampson.  This gives rise to an inference of an adverse employment action as Vitamix' failure to assign Sampson to the lucrative jobs negatively affected his compensation.[11]

On the fourth factor, the Court considers whether "similarly situated individuals outside [Sampson's] protected class were treated more favorably" or whether "other circumstances surrounding the adverse employment action give rise to an inference of

---

[11] Because the Court grants summary judgment on the constructive discharge claim, Plaintiff's allegation that his constructive discharge may constitute an adverse employment action is without merit.

discrimination." <u>See</u> <u>Fonseca</u>, 374 F.3d at 847. Defendant argues that Plaintiff has failed to show that the alleged comparators were "similarly situated" to his situation. Plaintiff simply argues that he was subject to disparate treatment and relies on Dr. White's expert report which looks at "comparators."

"In order to show that the employees allegedly receiving more favorable treatment are similarly situated . . . the individuals seeking relief must demonstrate, at the least, that they are similarly situated to those employees in all material respects." <u>Moran v. Selig</u>, 447 F.3d 748, 755 (9th Cir. 2006). "The employees' roles need not be identical; they must only be similar 'in all material respects.'" <u>Hawn v. Executive Jet Mgmt., Inc.</u>, 615 F.3d 1151, 1157 (9th Cir. 2010) (quoting <u>Moran</u>, 447 F.3d at 755); <u>see also</u> <u>Aragon v. Republic Silver State Disposal, Inc.</u>, 292 F.3d 654, 660 (9th Cir. 2002) (assertion that "only white or white-looking casuals were laid off, while non-white casuals remained employed to perform the same duties as Aragon's" sufficient to clear minimal prima facie bar.). "Materiality will depend on context and the facts of the case." <u>Hawn</u>, 615 F.3d at 1157.

Here, Plaintiff alleges that Caucasian sales representatives, with less tenure and living in farther proximity to Costco locations, were treated more favorably by being assigned to more lucrative shows; however, he does not provide any evidence, besides general statements in his deposition, to support this assertion. For comparators, Plaintiff solely cites to Dr. White's expert report where he conducts a statistical analysis on Plaintiff's comparators. However, there is no data concerning the comparators' tenure, location of residence, sales production, availability, and/or ability to work with others to show they are similarly situated to Plaintiff. The comparators named in White's report are those named by Sampson on page 89 of his deposition. (Dkt. No. 35-2, P's App'x, Ex. 12, White Expert Report at 110 & n.1.) On page 89 of his deposition, Sampson was asked, "what Caucasian sales representatives in the San Diego market do you believe were treated more favorably than you because of your race over the course of a year?" (Dkt. No. 35-2, P's App'x, Ex. 1, Sampson Depo. at 89:6-9.) In response, he stated,

"Stephanie Harris, Theresa Gregory, Mike Hudson, Jeff Werling, Sylvester Nunez." (Id. at 89:1-12.) Yet, Plaintiff has not set forth evidence that these five sales representatives were similarly situated in all material respects with him concerning the criteria for assignments such as tenure, sales history, location, availability, and ability to work with others. The comparators in White's report are not valid comparators for purposes of demonstrating disparate treatment. See McDaniels v. Group Health Co-op., 57 F. Supp. 3d 1300, 1311 (W.D. Wash. 2014) ("Valid comparators must be similar to the plaintiff "in all material respects."). Therefore, Plaintiff has not demonstrated that Vitamix treated him differently than similarly situated Caucasian sales representatives.

Next, Plaintiff also argues that direct racial comments by Guthrie and Paul reflect a negative attitude toward African-Americans as sales representatives and supports a prima facie case of disparate treatment. Defendant argues that the "Ninja, please" comment by Guthrie was a stray one, was made in context outside the decisional process and was in reference to Vitamix's competitor's product, the Ninja blenders and not racially motivated. Vitamix does not address Paul's comments.

When there is direct evidence of discriminatory intent, the McDonnell Douglas burden-shifting analysis does not apply. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985). Direct evidence . . . is defined as "'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision.'" Enlow v. Salem-Keizer Yellow Cab Co., Inc., 389 F.3d 802, 812 (9th Cir. 2004) (citation omitted). Biased remarks by a sales manager against or about an employee are admissible to show an employer's discriminatory animus if the person was involved in the employment decision. Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998). Stray remarks are not sufficient to demonstrate discriminatory animus. Merrick v. Farmers Ins. Grp, 892 F.2d 1434, 1438 (9th Cir. 1990). Whether the

person harboring a discriminatory animus was sufficiently involved in an employment decision is a dispute "for the trier of fact to resolve." <u>Godwin</u>, 150 F.3d at 1221.

Here, Guthrie's "Ninja, please" statement evokes a racial overtone that is offensive to African-Americans and these comments, while not directed to Plaintiff, were stated in his presence. Paul also made comments that African-Americans in the Vitamix booth would deter customers from buying the blender and they are not the representation Vitamix wanted for the company. Furthermore, Paul, as Regional Manager, and Guthrie, as Assistant Manager, were decision-makers responsible for Plaintiff's assignments. Therefore, in viewing the facts in the light most favorable to Plaintiff, the Court concludes that Plaintiff has established that these comments give rise to an inference of discrimination. Thus, Plaintiff has demonstrated a prima facie case of unlawful discrimination.

## 2. Legitimate Non-Discriminatory Reason

Defendant asserts that it had a legitimate, non-discriminatory reason for assigning Plaintiff to his sales assignments based on its criteria for assignments. Guthrie and Paul testified that they followed certain guidelines when assigning sales representatives to shows such as availability, proximity to the event, individual performance measured against historical average, tenure, and overall attitude of the sales representative. Its ultimate goal in the assignment of shows is to maximize the sales opportunity for the retailer, sales representative and Vitamix. It also asserts it maintains policies and procedures to prevent discrimination and retaliation including policies regarding equal employment, harassment/unacceptable work behavior and reporting procedures for incidents of alleged discrimination and retaliation. (Dkt. No. 34-4, D's App'x, Ex. T at 271.) Plaintiff does not oppose but instead argues that Vitamix' explanation for its scheduling criteria is merely pretexual.

Despite Defendant's asserted criteria for assignments, which was not memorialized in writing until 2016, it has not demonstrated the criteria's application to Plaintiff or its sales force. In fact, based on its criteria, the evidence presented demonstrates that

Plaintiff performed well as he was ranked 12th out of 151 sales representatives in sales commissions in 2015; he lived near the Costco locations at Mission Valley, Morena and also lived near Del Mar, the location of the San Diego County Fair; yet, he was never assigned to the Del Mar Fair and only worked one 6300 road show at Morena.

As to overall attitude, Plaintiff notes that Guthrie and Paul did not testify that overall attitude was a criteria for assignments and Plaintiff was never informed that his overall attitude affected his sales assignments. Interestingly, after Plaintiff's complaints to Neumann were made, Defendant solicited emails from three sales representatives, Stephanie Harris, Pam Werling and Theresa Gregory dated February 2016 detailing their negative work experiences with Plaintiff. (Dkt. No. 35-2, P's App'x, Ex. 11 at 103-06.) Defendant's attempt to demonstrate the overall negative attitude of Plaintiff as a criteria for sales assignments by requesting emails from other sales representatives to describe their negative working experience with Plaintiff, after an investigation into alleged discrimination was conducted, is not persuasive. Plaintiff has not provided any contemporaneous evidence of the application of the criteria for work assignments.

Despite Defendant's failure to demonstrate its application of the criteria for assignments, it is noted that as Plaintiff's tenure increased, his placement at more lucrative locations also increased as well as the number of days assigned and the amount of commissions earned. This plausibly demonstrates legitimate non-discriminatory reasons for Defendant's assignments of sales representatives.

### 3. Pretext

Plaintiff argues that direct and indirect evidence show that Vitamix's proffered explanation concerning sales assignments is not worthy of credence. Defendant asserts that it maintained guidelines used by its Regional Managers and Assistant Managers to schedule sales representatives to shows. (Dkt. No. 34-4, D's App'x. Ex. L, Guthrie Depo. at 20:4-20.) Moreover, Defendant argues that the "same actor" inference of no discriminatory motive applies where Guthrie, who Plaintiff alleges gave him unfavorable assignments, assisted Plaintiff in obtaining his job.

If the employer provides a legitimate, nondiscriminatory reason, the presumption of discrimination falls away, and the plaintiff must demonstrate that the articulated reason is pretext for unlawful discrimination. Aragon, 292 F.3d at 659. A plaintiff can prove pretext in two ways: "(1) indirectly, by showing that the employer's proffered explanation is "unworthy of credence" because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." Chuang, 225 F.3d at 1127. The burden of demonstrating pretext differs if plaintiff presents direct evidence or circumstantial evidence. Godwin, 150 F.3d at 1221.

The Court concluded above that Plaintiff had provided direct proof of discriminatory intent but failed to demonstrate an inference of discriminatory motive based on indirect evidence. Therefore, the Court addresses whether the direct evidence Plaintiff presents demonstrates that Vitamix' reasons for its assignments are pretextual.

If direct evidence of discriminatory motive is presented, "a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." Godwin, 150 F.3d at 1221 (amount of evidence needed is "very little."). Plaintiff need only produce "very little evidence of discriminatory motive to raise a genuine issue of fact." Lindahl v. Air France, 930 F.2d 1434, 1438 (9th Cir. 1991) (direct evidence of sexual stereotyping where employer believed that the female candidates get "nervous" and "gets easily upset [and] loses control."). "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." Godwin, 150 F.3d at 1221 (quoting Davis v. Chevron, U.S.A., Inc., 14 F.3d 1082, 1085 (5th Cir. 1994)).

Above, the Court concluded that racial comments by Guthrie and Paul demonstrated discriminatory intent and Plaintiff uses the same evidence to demonstrate pretext which is sufficient to raise an issue of fact on whether the application of Defendant's assignment criteria was discriminatory. See Chuang, 225 F.3d at 1128 (unlike in an indirect evidence case, direct evidence need not be specific and substantial,

but met even if evidence is not substantial); <u>Godwin</u>, 150 F.3d at 1221 (there was evidence of direct discrimination from statements between managers that one manager "did not want to deal with another female after having dealt with . . . Louise De PreFontaine."); <u>see also</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.,</u> 530 U.S. 133, (2000) (holding that if factfinder rejects employer's proffered nondiscriminatory reasons as unbelievable, it may infer "the ultimate fact of intentional discrimination" without additional proof of discrimination). In <u>Chuang</u>, pretext was met when a member of the Executive Committee stated in a meeting that "two Chinks" in the department were "more than enough", <u>id.</u> at 1128, and a statement by the chairman of the department to the plaintiff during the eviction process that they "should pray to [their] Buddha for help", <u>id.</u> at 1129. These comments were sufficient to raise a genuine issue of fact of discriminatory motive under the pretext analysis. <u>Id.</u>

Similarly, the statements and comments by Paul, the Regional Manager, and Guthrie, the Assistant Manager, that African-Americans are not the type of people Vitamix wants representing its company, that assigning an African-American to a booth would deter people from purchasing its products, and Guthrie's decision not to hire an African-African due to his race are sufficient to raise genuine issues of fact as to whether Vitamix' nondiscriminatory explanation is a pretext.

Defendant's argument concerning the "same actor" inference is also without merit. In the Ninth Circuit, "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." <u>Bradley v. Harcourt Brace and Co.</u>, 104 F.3d 267, 270-71 (9th Cir. 1996) (applying same actor inference when plaintiff was hired and terminated within a year by the same person). If the inference applies, then the plaintiff prevails only if he makes the "extraordinarily strong showing of discrimination" to rebut the inference. <u>Coughlan v. American Seafoods Co. LLC</u>, 413 F.3d 1090, 1097 (9th Cir. 2005) (inference not rebutted based on circumstantial evidence). Here, even if the same actor inference applies, it is rebutted by the direct

17cv233-GPC(BGS)

evidence of discriminatory animus based on racial comments made by Guthrie and Paul. See Villareal v. Chubb & Son., Inc., No. SACV 11-0674 DOC(RNBx), 2012 WL 3151254, at *6, 8 (C.D. Cal. July 31, 2012) ("direct evidence of discrimination would overcome same-actor inference").

Accordingly, the Court DENIES Defendant's motion for summary judgment on intentional race discrimination under Title VII, 42 U.S.C. § 1981 and FEHA.[12]

## C. Constructive Discharge

Defendant moves for judgment on the constructive discharge claim under California common law as Plaintiff has not demonstrated that his working conditions were so intolerable and aggravated that a reasonable person would be compelled to resign.[13] Plaintiff contends there are genuine issues of material fact that he was subject to constructive discharge.

"Constructive discharge occurs when the employer's conduct effectively forces an employee to resign." Turner v. Anheuser-Busch, Inc., 7 Cal. 4th 1238, 1244 (1994). An "employee must plead and prove . . . that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the

---

[12] In opposition, Plaintiff argues that Defendant cannot escape liability based on the Ellerth/Faragher affirmative defense on the claim of disparate treatment of Plaintiff. (Dkt. No. 35 at 27.) However, it does not appear Defendant invokes this affirmative defense in its moving brief. (Dkt. No. 34-1 at 26.) Moreover, Defendant does not address this issue in its reply. Under the Ellerth/Faragher affirmative defense, an employer may avoid liability for the acts of its employees for a hostile work environment if (1) it did not take a tangible employment action against Plaintiff; (2) it exercised reasonable care to prevent and correct discrimination; and (3) Plaintiff failed to take advantage of any preventative or corrective opportunities." Hardage v. CBS Broad., Inc., 427 F.3d 1177, 1184 (9th Cir. 2005). Because Defendant does not address the Ellerth/Faragher affirmative defense, the Court declines to consider Plaintiff's argument on this affirmative defense.

[13] In opposition, Plaintiff claims the complaint also alleges constructive discharge under Title VII, 42 U.S.C. § 1981 and FEHA as well as the common law claim. Since Defendant solely moves for summary judgment on the seventh cause of action for constructive discharge, the Court addresses only constructive discharge under California common law. Moreover, in his opposition, Plaintiff does not adequately distinguish, if any, between the constructive discharge claim under the three statutes at issue.

17cv233-GPC(BGS)

time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." Id. at 1251. Also, the "requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." Id. It is an objective standard inquiring "whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have not reasonable alternative except to quit." Id. at 1248.

"Whether conditions were so intolerable or aggravated under that standard is usually a question of fact; however, summary judgment against an employee on a constructive discharge claim is appropriate when, under the undisputed facts, the decision to resign was unreasonable as a matter of law." Scotch v. Art Inst. of California-Orange Cnty., Inc., 173 Cal. App. 4th 986, 1022 (2009). "The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." Turner, 7 Cal. 4th at 1246. The standard "is an objective one, and the proper focus is on the working conditions themselves." Simers v. Los Angeles Times Comm'ns, LLC, 18 Cal. App. 5th 1248, 1270 (2018).[14]

_____

[14] In Simers, Plaintiff listed ten conditions that forced him to resign "(1) the May 28 reduction in his columns from three to two per week; (2) Mr. Duvoisin's statement to Mr. James (conveyed to plaintiff at the May 28 meeting with Mr. James) that plaintiff was a 'public embarrassment' to The Times; (3) Mr. Duvoisin's criticism, conveyed at the May 28 and May 29 meetings, that plaintiff's writing was sloppy and not up to The Times's standards; (4) '[f]alse accus[ations] of unethical conduct'; (5) the suspension of his columns 'for an unreasonable 55 days' (June 24 to August 8); (6) on June 24, plaintiff was 'told not to say anything' about the investigation, so he could not 'explain himself to his sources. . .and fans, damaging his journalistic resources'; (7) he was '[d]amaged in his professional reputation with his column inexplicably absent for two months'; (8) his demotion to an 'entry-level assignment position, based upon false policy violations resulting from discriminatory motives'; (9) the August 8 final warning that 'placed [him] on a performance plan warning of potential termination'; and (10) the

Constructive discharge must be proved under a higher standard than demonstrating a hostile environment under Title VII.  See Holmes v. Petrovich Development Co., 191 Cal. App. 4th 1047, 1062 (2011) (citing Brooks v. City of San Mateo, 229 F.3d 917, 929 (9th Cir. 2000)).  In order to constitute constructive discharge, the harassment must be intolerable "at the time of the employee's resignation."  Brady v. Elixir Indus., 196 Cal. App. 3d 1299, 1306 (1987).

Sampson claims that he terminated his employment on March 7, 2016 because of what he reasonably perceived as intolerable working conditions.  The cumulative stress, of being assigned to less lucrative locations and shows, the failure of Vitamix to take prompt remedial action in response to his repeated complaints of discriminatory treatment, the suggestion by HR that he terminate his employment after he pursued his complaints of disparate treatment, the negative attitude towards him and his claims, and the toll that this treatment of him was taking on him and his wife, caused him to terminate his employment.  Defendant responds that the evidence demonstrates he was not treated unfairly but instead year after year, his assignments improved as he gained more experience and was ranked 12th out of 151 sales representatives in the Western Region on commission earnings in 2015.  Moreover, when Plaintiff reported the "Ninja, please" comment, Defendant took disciplinary action against Guthrie.

When Plaintiff reported the "Ninja, please" statement to Guthrie, and when Paul became aware of the statement, they did not report it to HR.  However, when Plaintiff reported the "Ninja, please" comment to HR around November/December 2015, Defendant promptly investigated the comments, acknowledged that the comments were made and took remedial action by placing Guthrie on corrective action and he was given a professional workplace e-learning to complete.  After reporting the comments to HR,

---

September 4 offer of 'an ambiguous columnist position, reporting to editors who falsely accused him and called him untrustworthy.'"  Simers, 18 Cal. App. 5th at 1270-71.  The court held these reasons, either alone or in combination, did not amount to unusually aggravated or a continuous pattern of mistreatment.  Id. at 1271.

Plaintiff testified he never heard the "Ninja, please" or any other racial epithets or comments again. (Dkt. No. 35-2, P's App'x, Ex. 1, Sampson Depo. at 118:14-17.) At the time of his voluntary termination on March 7, 2016, the racial comments by Guthrie had stopped at the latest in December 2015; therefore these statements cannot be a basis of Plaintiff's constructive discharge claim. See Brady, 196 Cal. App. 3d at 1306 (harassment must be intolerable "at the time of the employee's resignation."). As to Plaintiff's allegation that he was being treated differently than others, Plaintiff failed to demonstrate that he was subject to disparate treatment with similarly situated representatives based on his race and also cannot be evidence to support his constructive discharge claim.

What evidence remains on the constructive discharge claim is Plaintiff's assertion that the conditions at work were intolerable due to the tone and content of two emails by Pat Neumann dated January 15, 2016, exhibiting a negative attitude for his complaints of discriminatory treatment, and February 26, 2016, suggesting he find another job. He also claims the stress and frustration of everything going on at work led to sleepless nights for him and his wife. (Dkt. No. 35-2, P's App'x, Ex. 1, Sampson Depo. at 148:16-19.) He also went to the ER for chest pains from the stress and frustration related to Defendant's actions. (Id. at 21:8-23; 148:19-20; 153:5-13.)

The Court does not find that the two emails from Pat Neumann demonstrate an unusually aggravated or continued pattern of an adverse working condition. Moreover, Plaintiff's citation to cases are inapposite. First, in Perez v. Health, Case No. 15cv1792-HSG, 2016 WL 3439752, at *4 (N.D. Cal. June 23, 2016), a nurse alleged constructive discharge related to her stressful schedule and work assignments. Id. at 4. She claimed that her "daily four-hour float assignments," "increased workloads," "assignments to the postpartum unit despite her lack of a neonatal resuscitation license, and unexplained removal from the transport unit" made her working conditions intolerable. Id. Specifically, the "four hour float" assignments, also acknowledged by her supervisor, were stressful because it can lead to "incomplete documentation; incorrectly administered

medications; incomplete hand-off reports; and nurses' feelings of being rushed, fatigued, and stressed." Id. The plaintiff claimed she feared she would lose her license every day. Id. The plaintiff also provided evidence of a reasonable inference that she was singled out for these four hour float assignments. Id. at 5. Compared to Perez, Plaintiff's stress and working condition based on two emails do not rise to the level of an intolerable working condition.

In In Suk Kim v. Vilsack, Case No. C 10-2101 CW, 2012 WL 368477 (N.D. Cal. Feb. 3, 2012), the district court denied summary judgment on the constructive discharge claim because the plaintiff provided evidence that could establish that her supervisor "knowing that she would find work conditions in the laboratory intolerable, deliberately moved Plaintiff to the laboratory with the intention of forcing her to quit or creating a reason to terminate her." Id. at 14. This case is distinguishable from Plaintiff's as there is no evidence that his assignments at Costco locations were intolerable.

Finally, in Jeffery v. Yellow Transp. Inc., Case No. Civ. S-05-2306-RRB-EFB, 2007 WL 2226055 (E.D. Cal. July 21, 2007), the district court concluded that a reasonable person could find the plaintiff's condition of employment was so intolerable and discriminatory as to justify resigning. Id. at *10. The plaintiff alleged racial harassment by a group of predominately white co-workers who harassed him on a daily basis during his ten years of employment. Id. at *1. The harassment occurred in the presence of supervisors and managers who were aware of it but did not take any actions to prevent it. Id. When he complained about the harassment to management, it resulted in additional severe and retaliatory harassment. Id. Again, the Jeffery case is distinguishable from this case as Sampson did not demonstrate he suffered from continuous acts of discrimination.

Although the condition of Plaintiff's work environment may have been stressful due to a feeling he was not wanted or that Vitamix viewed his discrimination claims negatively, the evidence does not demonstrate that his working condition was so "extraordinary and egregious to overcome the normal motivation of a competent,

diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." See Poland v. Chertoff, 494 F.3d 1174, 1184 (9th Cir. 2007) (quoting Brooks, 229 F.3d at 930). The emails that Plaintiff claims exhibited a negative attitude toward him are not sufficiently compelling to conclude that his working conditions were intolerable. Despite his dissatisfaction with the number of "A" location road shows he was assigned to, as his time at Vitamix increased, the number of demonstrations at "A" locations, the number of days he worked, and his income increased in significant amounts in a short period of time. To an objective reasonable person, such conditions do not raise an issue of fact that Plaintiff's working conditions were so intolerable or aggravated that a reasonable person, in his positon, would be compelled to resign.

**D.  Punitive Damages**

Plaintiff seeks punitive damages under all causes of action. Title VII, § 1981 and FEHA allow for the recovery of punitive damages. See 42 U.S.C. § 1981a(b)(1); Cal. Civil Code § 3294.

As to the punitive damages under the federal statutes, Defendant argues that Plaintiff has not established that Vitamix subjected him to discrimination or that it acted with malice or reckless indifference to his federally protected rights. Plaintiff responds that the evidence demonstrates an issue of fact whether Vitamix acted with malice or reckless indifference.

Under federal law, Plaintiff may recover punitive damages if he demonstrates Vitamix "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." See 42 U.S.C. § 1981a(b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad v. American Dental Ass'n, 527 U.S. 526, 534 (1999). Punitive damages are only awarded for intentional discrimination claims. Id. In Kolstad, the Supreme Court rejected the contention that punitive damages

are available only in cases of an employer's "egregious" conduct. Id. To be liable for punitive damages, the employer "must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." Id. at 536.

Viewing the facts in the light most favorable to Plaintiff, the Court concludes that Plaintiff has established a genuine issue of material fact whether there was intentional, direct discrimination against him that could amount to malice or reckless indifference to his federally protected rights. Accordingly, the Court DENIES Defendant's motion for summary judgment on punitive damages on the federal claims.

On the claim of punitive damages under FEHA, Defendant argues that there is no clear and convincing evidence that an officer, director, or managing agent of Vitamix committed, authorized or ratified oppressive, fraudulent or malicious conduct. It argues that Plaintiff has not shown that Guthrie, as an Assistant Manager, had authority over decisions concerning Vitamix' corporate policy and was never a "managing agent." Plaintiff agrees that there is no evidence that Guthrie is a managing agent; however, a reasonable jury could conclude that Vitamix, by giving Guthrie and Paul carte blanche authority to make assignments without any written scheduling guideline and on Neumann's unquestioning acceptance of their representations during her investigation, ratified Guthrie and Paul's conduct of treating Sampson disparately with other Caucasian sales representatives.

An employer "may not be held liable for punitive damages based upon the acts of its employees unless the employer (1) 'had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others,' (2) 'authorized or ratified the wrongful conduct for which the damages are awarded,' or (3) 'was personally guilty of oppression, fraud, or malice.'" Rosas v. Chipotle Mexican Grill, Inc., CASE No. SACV 12-2189-JLS(RNBx), 2014 WL 12637412, at *3 (C.D. Cal. July 22, 2014) (quoting Cal. Civil Code § 3294(b)). As to a corporate employer, "the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer,

director, or managing agent of the corporation." Id. (quoting Cal. Civil Code § 3294(b)); College Hosp. Inc. v. Superior Ct., 8 Cal. 4th 704, 723 (1994) (for corporate employers, the malicious conduct must have been ratified or approved by a managerial agent). "Corporate ratification in the punitive damages context requires actual knowledge of the conduct and its outrageous nature." College Hosp. Inc., 8 Cal. 4th at 723.

Here, Plaintiff concedes that Guthrie is not a managing agent;[15] however, Plaintiff's argument concerning Vitamix' ratification of Guthrie's conduct is misguided. If Plaintiff seeks to pursue a theory of ratification, the ratification must have been on the part of the managing agent. Since Plaintiff agrees that Guthrie is not a managing agent, his argument on ratification also fails. Accordingly, the Court concludes that Plaintiff has not raised a genuine issue of material fact on punitive damages under the FEHA and GRANTS Defendant's motion for summary judgment on punitive damages under the FEHA as to Guthrie's conduct.

**E. Evidentiary Objections**

Plaintiff filed evidentiary objections to Defendant's evidence labeled as Exhibits B, C, 4, U and V filed in support of its motion for summary judgment. (Dkt. No. 35-3.) Defendants filed an opposition. (Dkt. No. 39-2.) In addition, Defendant filed general objections to Plaintiff's Appendix of Exhibits in support of his opposition. (Dkt. No. 39-3.) Plaintiff filed a detailed opposition. (Dkt. No. 40.)

The Court notes the parties' objections. To the extent that the evidence is proper under the Federal Rules of Evidence, the Court considered the evidence. To the extent that the evidence is not proper, the Court did not consider it.

/ / / /

/ / / /

---

[15] Defendant moves for summary judgment on punitive damages based on Guthrie's conduct only, and not Paul's. In response, Plaintiff does not state whether Paul is a managing agent or not although there is an implication he is not. (Dkt. No. 35 at 32.) Therefore, the Court rules solely on Defendant's motion for summary judgment on punitive damages as to Guthrie's conduct.

**F.    Request for Judicial Notice**

Defendant filed a request for judicial notice of courts dockets and filings of prior cases filed by Plaintiff against his former employers.  (Dkt. No. 34-2.)  Plaintiff did not file an opposition to the request for judicial notice but has objected to using these cases as part of the Court's ruling as irrelevant.

Rule 201 of the Federal Rules of Evidence authorizes the Court to take judicial notice of a fact that either "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  The Court may take judicial notice of matters of public record. <u>Lee v. City of Los Angeles</u>, 250 F3d 668, 688-690 (2001).  While the dockets may be subject to judicial notice, Defendant concedes that these filings have no direct relevance to the issues on summary judgment.  (<u>See</u> Dkt. No. 39-1, D's Reply to P's Response to D's SSUF at 2-3.)  Accordingly, the Court DENIES the request for judicial notice as irrelevant.

**Conclusion**

Therefore, the Court GRANTS Defendant's motion for summary judgment on the second, fourth, sixth, eighth and ninth causes of action as unopposed.  The Court DENIES Defendant's motion for summary judgment on the first, third, and fifth causes of action as well as claim for punitive damages under Title VII and 42 U.S.C. § 1981.  The Court also GRANTS Defendant's motion for summary judgment the seventh claim for constructive discharge and claim for punitive damages under the FEHA as to Guthrie's conduct.

IT IS SO ORDERED.

Dated:  June 21, 2018

Hon. Gonzalo P. Curiel
United States District Judge